**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ANTHONY J. FERNANDES and REBECCA**
**FERNANDES,**

                                        **Plaintiffs,**

                **v.**                                    **6:22-CV-476**
                                                          **(FJS/TWD)**

**STATE FARM FIRE AND CASUALTY COMPANY,**

                                        **Defendant.**
_____

**APPEARANCES**                          **OF COUNSEL**

**OFFICE OF GUSTAVE J. DETRAGLIA, JR.**  **GUSTAVE J. DETRAGLIA, JR., ESQ.**
1425 Genesee Street
Utica, New York 13501
Attorneys for Plaintiffs

**BARCLAY DAMON LLP**                    **MARK T. WHITFORD, JR. ESQ.**
2000 Five Star Bank Plaza
100 Chestnut Street
Rochester, New York 14604-2072
Attorneys for Defendant

**MEMORANDUM DECISION AND ORDER**

**I. INTRODUCTION**

        This insurance coverage action arises out of a property loss sustained at Plaintiffs'

property which, Defendant contends, was not a covered loss under the State Farm insurance

policy issued to Plaintiffs.  Defendant moves for summary judgment dismissing the action, *see*

Dkt. No. 31, which Plaintiffs oppose, *see* Dkt. No. 32, and to which Defendant files a reply, *see*

Dkt. No. 34.

        After the time to file a response to Defendant's motion had expired and without Court

leave, Plaintiffs filed a "Supplemental Memorandum of Law," *see* Dkt. No. 35; an affidavit from

Plaintiffs' expert witness with a copy of his expert report attached (identified by Plaintiffs' counsel as a "Motion to Supplement Pleadings"), *see* Dkt. No. 36; and an Affirmation from Plaintiffs' counsel in which he argues the merits of the case, explains why he did not timely provide Plaintiffs' expert witness statement, and asks the Court to "search the record and grant Plaintiffs summary judgment and an inquest for damages" (identified by Plaintiffs' counsel as a "First Motion for Summary Judgment"), *see* Dkt. No. 37.  Defendant responds, arguing that the Court should reject Plaintiffs' arguments, requests, and motions represented in Dkt. Nos. 36 and 37.  *See* Dkt. No. 38.

## II. BACKGROUND

The Court's ability to set forth the background facts of this case is complicated by Plaintiffs' insufficient compliance with the Local Rules, by the fact that Plaintiffs filed additional legal memoranda, factual arguments, and a motion to supplement the pleadings after Defendant's motion was fully submitted, and because Plaintiffs submitted some of this material in an untimely manner.

### A.      Local Rules

The Local Rules require a party moving for summary judgment to submit a "Statement of Material Facts," which sets forth, with specific citations to the record, each material fact about which the moving party contends there exists no genuine issue.  *See* N.D.N.Y. L.R. 56.1(a) ("The Statement of Material Facts shall set forth, in numbered paragraphs, a short and concise statement of each material fact about which the moving party contends there exists no genuine issue.  Each fact listed shall set forth a specific citation to the record where the fact is

established.").  "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.  It does not, however, include attorney's affidavits."  *Id.*  "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing the district courts from the need to hunt through voluminous records without guidance from the parties."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001) (citation omitted).[1]

Defendant submitted a Local Rule 56.1(a) Statement of Material Facts in support of its motion, citing to record support for each of its separately numbered paragraphs. *See* Dkt. No. 31-19 ("Def. SOMF").  Once a movant has submitted a properly supported Local Rule 56.1(a) Statement of Material Facts, the party opposing the motion shall

> file a separate Response to the Statement of Material Facts. The opposing party's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. <u>The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert</u>.

N.D.N.Y. L.R. 56.1(b); *see McCallion v. Marra*, No. 9:22-CV-0253 (GTS/CFH), 2024 WL 2078665, *5, n.5  (N.D.N.Y. May 9, 2024) (stating that, "[a]mong other things, Local Rule 56.1 (previously Local Rule 7.1(a)(3)) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs and supports any denials with a specific citation to the record where the factual issue arises" (citing N.D.N.Y. L.R. 56.1)).

---

[1] *Holtz* examined the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, which are substantially the same as N.D.N.Y. L.R. 56.1.  *See Holt*, 258 F.3d at 72-73.

The responding Statement of Material Facts is not a mere formality, and the courts apply this rule strictly.  *See N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1(a)(3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations"); *Gubitosi v. Kapica,* 154 F.3d 30, 31 n.1 (2d Cir. 1998) (*per curiam*) (accepting as true material facts contained in unopposed local rule statement of material facts); *Meaney v. CHS Acquisition Corp.*, 103 F. Supp. 2d 104, 108 (N.D.N.Y. 2000) (deeming movant's Rule 7.1(a)(3) Statement admitted where non-movant's response "set forth *no* citations – specific or otherwise – to the record"); *McKnight v. Dormitory Auth. of State of N.Y.*, 189 F.R.D. 225, 227 (N.D.N.Y. 1999) ("deem[ing] the portions of Defendants' 7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted"); *Osier v. Broome Cnty.*, 47 F. Supp. 2d 311, 317 (N.D.N.Y. 1999) (deeming admitted all facts in defendants' Rule 7.1(a)(3) statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record").

Plaintiffs submitted a response to Defendant's Statement of Material Facts in which they admitted some facts, denied others but without citation to the record where a factual dispute arose, and failed to respond to Defendant's paragraph 14.  *See* Dkt. No. 32-2 ("Pl. Resp. SOMF").  In addition, Plaintiffs provide an "Answering Affidavit" from Plaintiff Anthony J. Fernandes purportedly submitted in opposition to Defendant's motion in which he alleges certain facts and makes legal arguments relative to Defendant's motion but does not directly respond to Defendant's Statement of Material Facts.  *See* Dkt. No. 32, A. Fernandes Ans. Aff.

B.      **Relevant Facts**

        In setting forth the relevant facts, the Court construes the evidence in the light most

favorable to Plaintiffs, *see Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir. 2011), and takes into

account the often-stated judicial preference to resolve matters on the merits and not on

procedural default, *see Joe Hand Promotions, Inc. v. Kessler*, No. 5:20-cv-894 (TJM/ML), 2021

WL 4262665, *2 (N.D.N.Y. Sept. 20, 2021) (citing *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90,

95 (2d Cir. 1993)) (other citations omitted).  Unless stated otherwise, the Court cites Defendant's

Local Rule 56.1 Statement of Material Facts ("Def. SOMF") where Plaintiffs have either

admitted an asserted fact or have not adequately opposed a properly supported fact.  Where

appropriate, the Court also considers the admissible evidence that Plaintiffs submitted.

        *1. Homeowners Policy of Insurance*

        Defendant State Farm issued a Homeowners Policy of insurance to Plaintiffs as the

named insureds, bearing policy number 32 CX-6192-9 (the "State Farm Policy"). *See* Dkt. No.

31-19, Def. SOMF, at ¶ 1.  Plaintiffs were/are owners of real property located at 5361 Verplanck

Avenue, Beacon, New York ("insured premises" or "the Property").  *See id.* at ¶ 2.  The policy

expressly excludes, among other things, damage as a result of a frozen plumbing system unless

the insured "used reasonable care" to "maintain heat in the building structure at 55 degrees

Fahrenheit or higher" or "shut off the water supply and drain the system and appliances of

water." *See* Dkt. No. 31-10, Marigliano Aff., at ¶ 7; Dkt. No. 31-11, Policy.  As explained more

fully below, on January 27, 2021, Plaintiffs suffered property damage at the Property caused by

water running out of an internal water pipe into the insured premises (the "loss").  Defendant

determined that the loss was caused by frozen pipes occasioned because the heat was not on in

the subject premises.  *See* Dkt. No. 31-19, Def. SOMF, at ¶¶ 9-12.  Defendant denied coverage

on March 11, 2022, concluding that Plaintiffs did not exercise reasonable care to maintain heat in

the home to 55 degrees.  *See id.*  The central dispute in this case is whether Plaintiffs turned on

and maintained the heat in the insured premises[2] before leaving for Dubai.


### 2. *Plaintiffs' Absence from the Property*

Plaintiffs left the insured premises for Dubai on September 30, 2021, to visit Ms.

Fernandes' sister, with plans to return the following month, but thereafter extended their stay

until the end of February 2022.  *See* Dkt. No. 31-19, Def. SOMF, at ¶¶ 3, 5.  Before leaving for

Dubai, Plaintiffs gave their neighbor, Dean Fishley, a key to the insured premises in the event

there was an emergency and he needed to get inside.  *See id.* at ¶ 6.

In October of 2021, Mr. Fernandes called Mr. Fishley and asked Mr. Fishley to go inside

the Property to get medicine that was in the bedroom and mail it to Dubai.  *See* Dkt. No. 31-4,

Transcript of Deposition of Plaintiff Anthony J. Fernandes ("A. Fernandes Dep."), at pg. 21.[3]

Mr. Fishley and his wife went inside the Property, retrieved an inhaler and then left.  *See* Dkt.

No. 31-7, Transcript of Deposition of Dennis Fishley ("D. Fishley Dep."), at pg. 8.  He did not

touch the thermostats and to his knowledge his wife did not touch the thermostats either.  *See id.*

at pg. 13.  That is the only time Mr. Fishley or his wife entered the Property. *See* A. Fernandes

---

[2] The insured premises' heat source is a gas furnace for which Central Hudson provides gas, reads Plaintiffs' gas and electric meters (which are outside the house), and bills Plaintiffs every two months via email. *See* Dkt. No. 31-4, A. Fernandes Dep., at pgs. 12-14.

[3] When referring to page numbers of documents in the record, including transcripts of depositions, the Court cites to the page numbers that the Court's Case Management/Electronic Case Filing ("CM/ECF") system generates, which are found in the upper right corner of those pages.

Dep. at pg. 24; D. Fishley Dep. at pg. 13; *see* Dkt. No. 31-19, Def. SOMF, at ¶ 7 ("Mr. Fishley only went inside the insured premises once, to get an inhaler, and did not touch the thermostats.").  Near the end of October, when the weather started to cool, Mr. Fishley asked Mr. Fernandes if he wanted him to turn the thermostat on, and Mr. Fernandes declined. *See* Dkt. No. 31-19, Def. SOMF, at ¶ 8.

On January 27, 2021, Mr. Fishley was walking by the Property when he noticed a large ice formation on the Property's exterior, so he assumed pipes had frozen and burst.  *See* Dkt. No. 31-7, D. Fishley Dep., at pg. 14.  Mr. Fishley opened the door and saw water "gushing" out of the ceiling.  *See id.*  He did not go inside because he was afraid of being electrocuted.  *See id.* at pg. 15.  Rather, he called the City of Beacon Fire Department (the "Fire Department"). *See id.*

### 3. State Farm's Investigation & Conclusions

On February 2, 2022, State Farm Claim Specialist Jaimee Marigliano inspected the property with Plaintiff Anthony Fernandes. *See* Dkt. No. 31-10, Marigliano Aff., at ¶ 4.  Ms. Marigliano observed two thermostats in the Property, which were both in the "OFF" position. *See id.* at ¶ 5; *see also* Dkt. No. 31-6, Marigliano Dep., at pg. 21; Dkt. No. 31-4, A. Fernandes Dep., at pg. 40.  Plaintiffs confirmed that they had not touched the thermostats since leaving for Dubai in September 2021.  *See* Dkt. No. 31-10, Marigliano Aff., at ¶ 6; *see also* Dkt. No. 31-4, A. Fernandes Dep., at pg. 43.  The only explanation Mr. Fernandes had at the time as to why the working thermostat was "OFF" when he insisted that he had left it "ON" when he left for Dubai is that "somebody touched [the] thermostat when [he] was not there."  *See* Dkt. No. 31-4, A. Fernandes Dep., at pg. 41.  There is no dispute that the furnace was in working condition when Plaintiffs left for Dubai, when Mr. Fernandes returned to the Property on February 1, 2022, and

continued to be in working condition until at least October of 2022.  *See* Dkt. No. 31-4, A.
Fernandes Dep., at pgs. 31-34.

      As part of her investigation, Ms. Marigliano contacted representatives of the Beacon Fire
Department and Beacon Water Department, and they both purportedly confirmed that no
officials would have touched the thermostats when they were at the Property following the loss.
*See* Dkt. No. 31-10, Marigliano Aff., at ¶ 6.

      In March of 2022, Keith Madigan, a licensed professional engineer with more than 30
years of experience in providing building and infrastructure design, construction management,
and consulting services, and Vice President/Senior Engineer IV with J.S. Held Engineering
Services, PLLC, conducted an engineering assessment regarding a water supply line failure at
the Property.  *See* Dkt. No. 31-34, Madigan Aff., at ¶¶ 1-2.  Mr. Madigan reached opinions and
conclusions relative to the cause of the loss based on a review of Plaintiffs' utility records, local
climatology data from the U.S. Department of Commerce's National Oceanic & Atmospheric
Administration, and a site inspection (and photographs) on February 24, 2022.  *See id.* at ¶ 5.

      Plaintiffs produced their Central Hudson invoices, which Defendant attached to their
motion.  *See* Dkt. No. 31-8, Utility Bills.  For the billing period of September 16, 2021 through
November 12, 2021, Plaintiffs used no electricity and 13 centum cubic feet ("CcF") of natural
gas, about one-third the amount of gas used for the same billing period the year prior (36 Ccf).
*See* Dkt. No. 31-19, Def. SOMF, at ¶ 16.  Mr. Fernandes received that bill via email sometime in
December.  *See* Dkt. No. 31-4, A. Fernandes Depo., at pgs. 46-47.  He noticed the amount of gas
used but it did not "strike [him] as low," even though he thought he set his thermostat to 65
degrees and usually had it between 60 and 68 degrees.  *See id.* at pgs. 47-49.  For the billing
period of November 13, 2021 through January 14, 2022, Plaintiffs used 12 Ccf of gas, almost ten

times less than the same billing cycle in the prior year (108 Ccf).  *See* Dkt. No. 31-19, Def.

SOMF, at ¶ 17.  Mr. Fernandes did not contact Central Hudson to see why he used so much less

gas because he was "happy the bill was low."  *See* Dkt. No. 31-4, A. Fernandes Depo., at pg. 51.

For the billing period of January 15, 2022 through January 28, 2022, Plaintiffs used only 8 Ccf of

gas, down from 156 Ccf gas used the prior year.  *See* Dkt. No. 31-19, Def. SOMF, at ¶ 17.

Between January 25, 2022, and January 28, 2022, there were very cold temperatures in

the Beacon, New York region.  On January 27, 2022 (the date of the loss), the maximum

temperature was 28 degrees Fahrenheit, and the minimum temperature was 2 degrees Fahrenheit.

*See* Dkt. No. 31-9, National Oceanic & Atmospheric Administration Records; *see also* Dkt. No.

31-19, Def. SOMF, at ¶ 20 ("On the date of the loss, the temperature in Beacon never rose above

28 Degrees Fahrenheit.").

Mr. Madigan attests:

> 3. As discussed in my report, I came to the following conclusions
> regarding the water supply line failure:
>
> The cause for the failure of the piping system was the formation of
> ice within the water supply pipe.  The ice formation increased the
> pressure within the pipe of the plumbing system.  The increased
> pressure caused greater forces to be imparted on the system and
> between the connections.  A nearby obstruction/restriction
> combined with a pre-loss installation defect at the shower's valve
> caused horizontal movement that separated the soldered fitting,
> pushing the pipe end away from the valve.  The ice formation was
> due to the exposure of a portion of the water supply piping to
> below freezing temperatures and lack of water flow within the
> piping system.  The sustained exposure of the piping to freezing
> temperatures was indicated by my review of local weather
> conditions before and after the time of the loss as well as the lack
> of heat provided within the property at the time of the loss based
> on my review of the utility records of the property. . . . The lack of
> water flow was indicated by the property reportedly being
> unoccupied immediately before and on the date of loss.

4. More specifically, as the water in the pipes froze, it created ice which expanded within the pipe exerting pressure on the non-frozen water within the piping system.  As the ice continued to build, the pressure within the piping system continued to increase until the piping failed at a weak point (the pipe end that was pushed away from the valve).

See Dkt. No. 31-34, Madigan Aff., at ¶¶ 3-4 (internal footnote omitted).  Mr. Madigan further attests that the Ccf amounts of 8 and 12 are negligible and are likely due to inefficiencies in the system and not for actual heating use.  See id. at pg. 2, n.1.

State Farm's investigation determined that the cause of the loss was the failure of the piping system due to formation of ice within the water supply pipe which caused increased pressure within the pipe which led to horizontal movement that separated the soldered fitting, pushing the pipe end away from the valve. See id. at ¶ 3.  State Farm further concluded that the freeze happened because Plaintiffs failed to maintain heat in the home.  See Dkt. No. 31-6, Marigliano Dep., at pg. 21.

After completing its investigation, State Farm advised Plaintiffs it was denying coverage based on Plaintiffs' failure to use reasonable care to either maintain heat or shut off the water supply and drain the system of water.  See Dkt. No 31-19, Def. SOMF, at ¶ 22 ("State Farm denied coverage on March 11, 2022 because the Plaintiffs did not exercise reasonable care to maintain heat in the home to 55 degrees, and the State Farm policy specifically excludes coverage for freeze damage when the heat is not maintained to 55 degrees or higher." [Marigliano Aff., ¶ 7, Exhibit A]).  Notwithstanding its denial of coverage, "State Farm agreed to pay for the Plaintiffs' additional living expenses (hotel) in the amount of $3,676.88 from February 1, 2022, to March 11, 2022, while the investigation was pending. See id. at ¶ 23 (citing [Marigliano Aff., ¶ 9]) .

### 4. Plaintiffs' Position

Plaintiff Anthony J. Fernandes testified at his deposition that, although the thermostats were at 35 degrees (essentially in the off position) when he first returned to the Property, he did not know "who put it off," he did not himself "put that," that the heat was "on" when he left for Dubai in September 2021, and that when he left he programed the thermostat on "hold" so it would not change, and put the heat on at 65 degrees.  *See* Dkt. No. 31-4, A. Fernandes Dep., at pgs. 40-43.  Plaintiff Anthony Fernandes admits that he did not touch the thermostat after he returned from Dubai but postulates that someone else might have touched it and changed it to the off position.  *See id.*; *see also* Dkt. No. 32, A. Fernandes Answering Aff., at ¶ 7 ("That I also testified, and I hereby again indicate under oath, that I did keep the heat on above 55 degrees when I left the premises."); ¶ 10 ("That numerous fire department and police department personnel were at the property after the loss, and it is unknown if they in fact shut the heat off[.]"); ¶ 11 ("Mr. Fishley, our neighbor, was deposed and he indicated that he did not touch the heat, however, his wife was not deposed.").  He also postulates that it is possible that the furnace and its thermostat may have intermittently failed. *See id.* at ¶ 20 ("There is no indication, however, as to whether the furnace had intermittently failed and/or the thermostat intermittently failed, which could have resulted from the lower gas usage as indicated by the Defendant's motion.").

Plaintiff Anthony Fernandes further contends that a frozen pipe may not have been the cause of the water damage.  *See id.* at ¶¶ 3-6, 22-30.  In this regard, he asserts the following:

> 3. This water loss occurred when a shower control valve failed and came apart from the pipe that supplied the shower.
>
> 4. That it has not been conclusively proven whether or not the joint came apart because it froze or whether it simply failed and came apart.

5. That the shower valve is on an interior wall and would not be subject to the same freezing temperatures as plumbing closer to the outside walls of the house.

6. That I had engineer, Don Ehre, examine the loss and his report is attached hereto.

* * *

22. That Defendant's investigation is the opposite of my engineer's investigation and opinion and again creating a question of fact, but even more so my engineer's opinion, as well as my sworn statement that the heat was on when I left the property, establishes coverage as a matter of law.

23. As indicated by defense counsel, we had a neighbor with access to the property that could have easily been instructed to turn on the heat, but that was not necessary since the heat was left on.

24. I did not fail to maintain the heat as argued by defense counsel.

25. Notably, the Affidavit of Jaimee Marigliano indicated that as part of the investigation by the Defendant, the Beacon Fire Department and Beacon Water Department both confirmed that no officials would have touched the thermostat when they were at the property following the loss. However, he [sic] did not interview any or all first responders to determine whether in fact they may have turned off the heat due to the water running all over the townhouse, not only to protect themselves, but for others entering the building.

26. Again, the valve may have simply came [sic] apart from the not as good soldered joint as it could have been, rather than the pipe freezing. There were no split pipes, which are common evidence of frozen plumbing.

27. The control valve that turns the water on and off and controls the hot and cold water from the supply line simply broke apart from the supply line.

28. It is interesting to note that the Defendant paid for additional living expenses, even though they claim they had no coverage for my loss.

29. As indicated by Defendant's engineer, Keith Madigan, in his affidavit he states[,] "A nearby obstruction/restriction combined with a <u>pre-loss installation defect</u> (emphasis applied) that the shower value caused horizontal movement that separated the soldered fitting, pushing the pipe away from the valve."

30. This statement confirms what my engineer said that in fact there was a pre-loss installation defect that came apart.  There was no explanation why there was no heat when none of the pipes closer to the exterior walls had split or burst.  The shower valve again is on an interior wall.

*See* Dkt. No. 32, A. Fernandes Aff., at ¶¶ 3-6, 22-30.

Plaintiffs argue that, because of the existence of these questions of fact, Defendant has not met its burden of proof on its motion; and, therefore, the Court should deny Defendant's motion for summary judgment.  *See id.* at ¶ 31.  Plaintiffs further assert that "[f]or all the reasons set forth herein, your deponent respectfully requests summary judgment declaring . . . that the Plaintiffs' loss is covered as a matter of law."  *See id.*

### 5. *Mr. Ehre's Report*

In preparing his report, Mr. Ehre reviewed "Daily Weather Records for November and December of 2021; Report by JS Held Engineering Services, dated March 9, 2022, which included the weather data for January, 2022; Gas and Electric bills for July 16-Sept. 15, 2021, Sept. 16-Nov. 12, 2021, and Nov. 22, 2021-Jan. 14, 2022; [and] Photographs taken by the contractor[4] during the walk through on February 24, 2022." *See* Dkt. No. 32-1, Ehre Report, at pg. 1.  Mr. Ehre explains that Plaintiffs' residence "is a two story, wood framed townhome which shares one wall with the neighboring residence."  *See id.*  "The residence contains a concrete

---

[4] The Court presumes Mr. Ehre is referring to Mr. Madigan when he references "the contractor."

walled basement area in which the hot water heater and the furnace is located." *See id.* "The

furnace supplies heat to the upper floors which is controlled by a thermostat located on the first

floor." *See id.* "The basement area is heated by electric heat controlled by a thermostat located

in the basement." *See id.*

Mr. Ehre asserts as follows:

> Upon discovery by the neighbor, the Beacon Fire
> Department was permitted to enter the premises. The fire
> department shut off the water service, electric service and gas
> service to the residence and performed an initial assessment of the
> damage and discovered that there was a water leak in the area of
> the upstairs bathroom. Further examination by the contractor
> found that the hot water line serving the shower control valve had
> separated from the body of the valve. This connection was
> evaluated by the contractor, and he found that this soldered
> connection was very poorly done. There was evidence of
> corrosion (patina) of the copper lines at the shower connections
> which indicates that minor leakage had previously occurred in the
> past at this valve. It is very likely that minerals in the water supply
> had resealed these minor leaks before they became a problem.

> Within the report submitted by J S Held, it is stated on Page
> 2, "Initially the loss was reported as a pipe freeze ..... The
> contractor located a break in the plumbing below (above) the 2nd
> floor shower and reported it was due to a bad solder. We are
> currently still investigating coverage for this claim." And further
> states, "No other locations were identified to be leaking or failed,
> besides the location at the valve for the second story shower."

> In the Executive Summary, J S Held states, "The cause for
> the failure of the piping system was the formation of ice within the
> water supply pipe. The ice formation increased the pressure within
> the pipe of the plumbing system. The increased pressure caused
> forces to be imparted on the system and between there [sic]
> connections. A nearby obstruction/restriction combined with a
> pre-loss installation defect at the shower's valve caused horizontal
> movement that separated the soldered fitting, pushing the pipe end
> away from the valve." And "The ice formation was due to the
> exposure of a portion of the water supply piping to below freezing
> temperatures and lack of water flow within the piping system."
> Within the report, J S Held notes on Page 3, note 5, "There was no

apparent deformation of the copper pipes throughout the runs that were visible."

I have reviewed the weather data for the months of November, December and January. For all but eight days in November, the low temperatures were below freezing with the lowest being 18 degrees.  Also, for all but seven days in December the low temperatures were below freezing, with the lowest being 16 degrees.  Finally, for the month of December, leading up to the 27th, the below freezing temperatures occurred nearly every day, but maximum temperatures above freezing most days.  There were single digit temperatures on 8 different days prior to the 27th, the lowest being zero on the 16th.

Several other possibilities can explain the loss of heat in the residence and the cause of the failure of the pipe connection to the shower valve.

The residence and the furnace are 22 years old.  It is possible that the furnace failed during the period that the owner was away.  It has been reported that other residents have had their furnaces replaced.  Also, in the photographs provided by the contractor, the hot water heater was replaced in May of 2015.  This demonstrates the aging of the equipment.

The fact that there were no apparent deformations of the copper pipes indicates that a frozen pipe condition had not occurred.  The failed connection to the shower control valve occurred in an interior second floor wall not an exterior wall.  First, pipes generally freeze within exterior walls where the outside temperatures have a greater effect.  Second, this occurred on the 2nd floor where temperatures are generally warmer since heat rises.

The failure of the shower pipe-valve connection could be due to age.  As noted by J S Held, there was a patina on the pipes in this area which indicated past "minor" leakage at this connection point.  It is reasonable to assume that the joint simply failed.

J S Held notes that when water freezes, the molecular structure of water expands, and that this can raise pressure on the pipes where the freeze happens and nearby connections. Since the connection failure occurred in an interior wall and since pipes generally freeze within or in close proximity to cold exterior walls, this doesn't appear to be a reasonable conclusion.  J S Held also states that a frozen pipe will raise pressure in the water supply line.

15

> The fact is that the water lines are constantly being exposed to pressure changes that reflect the changes in the pressure within the water mains to which the water service lines are connected as the water usage changes during the day and as the levels within the water system's storage tanks rise and fall. These area wide pressure variations can range between 5 and 10 PSI. It is likely that these variations over the past 22 years resulted in the failure of the shower connection.
>
> It is my professional opinion that the other possibilities, as enumerated above, are as likely the cause as the singular cause stated in the J S Held report. Since no pipe deformations are evident within the home, frozen piping does not appear to be the proximate cause for the loss.

*See id.* at pgs. 1-3.

### 6. Defendant's Response

Defendant responds that Plaintiffs' argument addressed to whether someone else may have changed the thermostat, or that the heater and/or thermostat may have malfunctioned, is based on nothing more than speculation which is insufficient to withstand a motion for summary judgment.

Regarding Plaintiffs' second argument, that the cause of the leak may not have been from a frozen pipe, Defendant notes that the argument rests entirely on Plaintiffs' expert opinion but contends the Court should disregard this opinion because it was not timely provided. Defendant notes that, per the Court's June 9, 2022 Order, Plaintiffs were required to serve their expert disclosure by January 17, 2023. *See* Dkt. No. 13. Defendant maintains that, despite Plaintiffs' expert report being dated August 1, 2022, State Farm received that report, and notice that Plaintiffs had retained an expert, for the first time when Plaintiffs attached it to their opposition papers filed on September 20, 2023. *See* Dkt. No. 34, Attorney Reply Affirmation, at ¶ 7. Defendant argues that, because discovery has now closed, *see* Dkt. No. 13 ("All discovery in this

matter is to be completed on or before 4/28/2023"); Dkt. No. 30, Text Order dated July 5, 2023

("no other discovery [except for the non-party deposition of Justin Fishley] is permitted").  State

Farm does not have the ability to depose Mr. Ehre or conduct any other discovery related to his

report.  *See* Dkt. No. 34, Attorney Reply Affirmation, at ¶ 8.  Thus, Defendant contends,

Plaintiffs' "sandbagging" should not be allowed.  *See id.*

In addition, Defendant argues that "the [expert] report is not in admissible form as there

is no affidavit or declaration from Mr. Ehre, but only attached to Plaintiff's affidavit."  *See* Dkt.

No. 34-1, Defendant's Reply Memorandum of Law, at 4.  "The report also does not indicate that

Mr. Ehre ever visited the premises, inspected any of the equipment or performed any sort of

testing to form any professional opinions to a reasonable degree of engineering certainty about

the cause of the loss."  *See id.*  Thus, Defendant argues, "the report (in addition to being

untimely) provides no evidentiary support for Plaintiffs' purported theory about how the loss

occurred."  *See id.*

### 7. Plaintiffs' Additional Filings/Putative Sur-Reply

In an apparent attempt to submit an unauthorized sur-reply to Defendant's motion,

Plaintiffs submitted a "Supplemental Memorandum of Law," *see* Dkt. No. 35; an affidavit from

Plaintiffs' expert witness with a copy of his expert report attached (identified by Plaintiffs'

counsel as a "Motion to Supplement Pleadings"), *see* Dkt. No. 36; and an Affirmation from

Plaintiffs' counsel in which he argues the merits of the case, explains why he failed to timely

provide Plaintiff's expert witness statement, and asks the Court to "search the record and grant

Plaintiffs' summary judgment and an inquest for damages" (identified by Plaintiffs' counsel as a

"First Motion for Summary Judgment"), *see* Dkt. No. 37.

Defendant responds, arguing that the Court should reject Plaintiffs' arguments, requests, and motions represented in Dkt. Nos. 36 and 37. *See* Dkt. No. 38. In this regard, Defendant notes that it "filed its motion for summary judgment on August 31, 2023 (Dkt. No. 31). Plaintiffs timely opposed [Defendant's] motion on September 20, 2023 (Dkt. No. 32). [Defendant] filed its reply on September 28, 2023 (Dkt. No. 34)." *See* Dkt. No. 38 n.1. Plaintiffs filed both of their "motions" after September 28, 2023, seemingly in response to Defendant's reply.

As to the "Motion to Supplement Pleadings," Defendant contends that, on September 29, 2023, Plaintiffs filed a document that appears to be an Affidavit from Plaintiff's expert, Donald Ehre. *See* Dkt. No. 38, Attorney Aff. in Opposition, at ¶ 3 (citing Dkt. No. 36). Defendant maintains that "Plaintiffs presumably filed this in an attempt to submit the affidavit in evidentiary form, which was lacking in Plaintiffs' original opposition to [Defendant's] motion, as pointed out in its reply. *See id.* Defendant points out that the deadline for any opposition to its motion was due by September 21, 2023. *See id.* at n.1 (citing Dkt. No. 31). Defendant further maintains that, "[t]o the extent the affidavit was not timely submitted in opposition to [Defendant's] motion for summary judgment," the Court should disregard it. *See id.* at ¶ 3. In this regard, Defendant contends that, because "[t]here is no basis to supplement any prior pleadings in this case[,]" the Court should deny Plaintiffs' "motion" to Supplement the Pleadings in its entirety. *See id.*

Defendant also notes that, "[o]n October 3, 2023, Plaintiffs filed a document labeled "'First MOTION for Summary Judgment.'" *See* Dkt. No. 38 at ¶ 4. As Defendant indicates, "[t]hat document appears to be an Affidavit from Plaintiffs' counsel in further opposition/sur-reply to [its] motion for summary judgment that attempts to explain why the expert affidavit was not included in Plaintiffs' original opposition papers." *See id.* Defendant argues that the Court should disregard this belated attempt to oppose its motion because (1) "the deadline for any

18

opposition to [Defendant's] motion was due by September 21, 2023," and (2) "pursuant to the

Court's Text Order dated July 5, 2023 (Dkt. No. 30), any dispositive motions had to be filed by

August 31, 2023." *See id.*  Thus, Defendant contends, the Court should deny Plaintiffs' motion

for summary judgment, filed on October 3, 2023.  *See id.*

## III. STANDARD OF REVIEW

On a motion for summary judgment the Court must construe the properly disputed facts

in the light most favorable to the non-moving party, *see Scott v. Harris*, 550 U.S. 372, 380

(2007), and may grant summary judgment only where "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "A

fact is material if it 'might affect the outcome of the suit under the governing law[.]'" *Baldwin v.

EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quotation omitted).  An issue is genuine

if the relevant "evidence is such that a reasonable jury could return a verdict for the non-moving

party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

"The moving party bears the burden of establishing the absence of any genuine issue of

material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010)

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 911 L. Ed. 2d 265 (1986)).

Once a defendant has met this initial burden, the plaintiff must "designate specific facts showing

that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 322, 324 (1986)

(internal quotation marks omitted).  "A party opposing a properly supported motion for summary

judgment may not rest upon 'mere allegations or denials' asserted in his pleadings, *Rexnord

Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or

unsubstantiated speculation[,] *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)." *J.M. v. Sessions*, No. 20-CV-0091 (GTS/CFH), 2024 WL 3377958, *1 (N.D.N.Y. July 11, 2024).

The Court's inquiry upon summary judgment is "determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

Here, both Defendant and Plaintiffs have moved for summary judgment, "but that phenomenon 'does not mean that the court must grant judgment as a matter of law for one side or the other.'" *Everett v. Dean*, No. 3:20-CV-01260 (AMN/ML), 2023 WL 5452753, *4 (N.D.N.Y. Aug. 24, 2023) (quoting *Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean*, 667 F.2d 305, 313 (2d Cir. 1981); *see also Residential Mgmt. (N.Y.) Inc. v. Fed. Ins. Co.,* 884 F. Supp. 2d 3, 7 (E.D.N.Y. 2012) ("Cross-motions for summary judgment do not alter the basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute.") (citations omitted)). "Rather, the court 'must consider each motion separately and on its own merits and draw all reasonable inferences against the party whose motion is under consideration.'" *Id*. (quoting *Abreu v. Romero*, No. 08 CIV. 10129 (LAP), 2010 WL 4615879, at *3 (S.D.N.Y. Nov. 9, 2010), *aff'd*, 466 F. App'x 24 (2d Cir. 2012)).

## IV. DISCUSSION

**A.      Late Expert Witness Disclosure**

The Court starts with determining whether Plaintiffs may rely on their expert witness report in opposing Defendant's summary judgment motion.

Under Rule 26(a)(2)(d) of the Federal Rules of Civil Procedure, a party must disclose an expert witness "at the times and in the sequence that the court orders."  Local Rule 26.3 provides in pertinent part:

> There shall be binding disclosure of the identity of expert witnesses.  The parties shall make such disclosure, including a curriculum vitae and, unless waived by the other parties, service of the expert's written report pursuant to Fed. R. Civ. P. 26(a)(2)(B), before the completion of discovery in accordance with the deadlines contained in the Uniform Pretrial Scheduling Order or any other Court order.  Failure to comply with these deadlines may result in the imposition of sanctions, including the preclusion of testimony, pursuant to Fed. R. Civ. P. 16(f).

N.Y.N.D. L.R. 26.3.

The pretrial scheduling order in this case provides that "[n]o later than 1/17/2023, **plaintiff(s)** shall identify such expert(s) and, unless waived, shall serve on the other parties the expert's written report pursuant to Fed. R. Civ. P. 26(a)(2)(B)."  *See* Dkt. No. 13, Uniform Pretrial Scheduling Order, at 2.

Further, under Rule 37(c)(1) of the Federal Rules of Civil Procedure, "[a] party is not allowed to use [an undisclosed expert] witness to supply evidence on a motion ... unless the failure [to disclose] was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  This rule seeks to deter the unfair practice of sandbagging the opposing party.  *GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.,* 943 F. Supp. 2d 320, 329 (N.D.N.Y. 2013) (quotation omitted).  "Failure to timely serve such reports requires the reports be stricken and the related expert's trial

testimony precluded unless the failure was substantially justified or is harmless."  *Scharrer v. United States*, No. 13-CV-1156S(F), 2016 WL 3457933, *1 (W.D.N.Y. June 30, 2016) (citing Fed. R. Civ. P.  37(c)(1)).  "However, it is well settled that the district court has broad discretion in determining whether to impose sanctions for late expert disclosure, as well as the choice of sanction." *OnActuate Consulting, Inc. v. Aeon Nexus Corp.*, No. 1:20-CV-508 (AMN/CFH), 2023 WL 5835845, *1 (N.D.N.Y. Sept. 8, 2023).

> As the Southern District of New York recently reiterated,
>
> > [i]mposing Rule 37(c) sanctions does not require a showing of bad faith by the offending party.  *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006).  However, "preclusion of evidence pursuant to 37(c)(1) is a drastic remedy and should be exercised with discretion and caution."  *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004).  Additionally, "preclusion of an expert report can be a harsh sanction."  *Sandata Techs., Inc.*, 2007 WL 4157163, at *7.  Before courts use the "extreme sanction of preclusion," they should "inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses."  *Outley v. City of New York*, 837 F.2d 587, 591 (2d Cir. 1988).
>
> *Peerless Network, Inc. v. AT&T Corp.*, No. 15-CV-870 (VM)(VF), 2022 WL 3700141, *4 (S.D.N.Y. Aug. 26, 2022).

*OnActuate Consulting*, 2023 WL 5835845, at *2.

"In assessing whether to preclude an expert's report, courts should consider: (1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *GlobalRock Networks*, 943 F. Supp. 2d at 329-30 (citing  *Patterson v. Balsamico,* 440 F.3d 104, 117 (2d Cir.2006)); *see Softel, Inc. v. Dragon Med. & Sci. Commc'ns*, 118 F.3d 955, 961 (2d Cir.

1997).  The Court has discretion in applying Rule 37(c)(1) to preclude evidence.  *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006).

Plaintiffs have not sufficiently justified the late disclosure of their expert witness. Plaintiffs' counsel asserts that "Mr. Ehre sent his report a while ago, but it wasn't signed and it went into the file, and I noticed that it wasn't signed when I prepared the response to the motion. I called him to come to my office to sign it, which he did do.  I didn't redate it.  I was not holding it back and there was no reason to do so.  It was just an oversight on his part that he mailed it without it being signed."  *See* Dkt. No. 37, Attorney Aff., at ¶ 4.  This response is insufficient.

Upon learning that Mr. Ehre had not signed his expert witness report, Plaintiffs' counsel should have exercised reasonable diligence to rectify the situation and immediately notified Defendant of its existence, not simply placed the report in the file and forgot about it until Defendant moved for summary judgment.  "It [is] an exceedingly simple, perfunctory task to give notice of witnesses as required by Rule 26(a)[ ] but one which [is] important to permit defendants to meet [the expert's] testimony."  *Kullman v. New York*, No. 07-CV-716 (GLS/DRH), 2009 WL 1562840, *8 (N.D.N.Y. May 20, 2009) (citation omitted).  Plaintiffs' counsel's lack of diligence in following up with Mr. Ehre and notifying Defendant of his report in a timely fashion before the close of discovery to allow Defendant an opportunity to depose the witness could cause Defendant significant prejudice.  By waiting until after discovery had closed, and simply contending that the failure to timely disclose was an oversight, Plaintiffs deprived Defendant of evidence that could be important to Defendant's defense of this action and which presents an unchallenged opinion on the pending summary judgment motions.  Plaintiffs' omission presents the classic case of sandbagging.  Thus, the Court finds that the first factor weighs heavily in favor of preclusion.

The second and third factors also weigh in favor of preclusion.  It is undisputed that Defendant became aware of Plaintiffs' expert for the first time when Plaintiffs attached the August 1, 2022 report to their opposition.  The expert disclosure deadline had long passed, and discovery is now closed.  Defendant does not have the ability to depose Plaintiffs' expert or conduct any other discovery related to that report.  As the Court indicated in *GlobalRock*, "with [the expert] affidavit, plaintiff is seeking to introduce a new opinion from a previously unidentified expert.  Based upon the record, defendant will suffer prejudice if the Court accepts [the affidavit] in opposition to the pending motion for summary judgment.  Accordingly, for the foregoing reasons, for purposes of deciding the motion for summary judgment, this Court has disregarded [the affidavit]." *GlobalRock,* 943 F. Supp. 2d at 331.

The fourth factor, whether the Court should grant a continuance, also supports preclusion – at least for purposes of the pending summary judgment motions.  The motions have been pending for some time, but Plaintiffs did not previously seek, and do not seek now, an extension of the expert witness disclosure deadline, an extension of the discovery deadline, or an extension of the time to respond to Defendant's motion.  Absent such requests, and given the present posture of the pending summary judgment motions, the Court will disregard Plaintiffs' expert report for purposes of the pending summary judgment motions.  This decision does not present an undue hardship to Plaintiffs because, for reasons discussed below, the Court will deny the pending summary judgment motions.  Whether Plaintiffs should be allowed to use Mr. Ehre's opinions at trial is a subject separate from the pending motions, and one which should be addressed through subsequent motions.  Thus, Plaintiffs' "Motion to Supplement Pleadings," *see* Dkt. No. 36, is denied with leave renew in connection with the trial of this matter.

**B.     Defendant's Summary Judgment Motion**

Assuming *arguendo* that the loss was caused by a frozen interior pipe occasioned by the failure to maintain sufficient heat in the insured premises while Plaintiffs were in Dubai, Plaintiffs have submitted sufficient evidence upon which a reasonable factfinder could conclude that a material question of fact exists as to the cause for the loss.  In this regard, Plaintiff Anthony J. Fernandes attests that, when he and his wife left for Dubai, the thermostats in the Property were in the "ON" position, and that he set the thermostat connected with the furnace on "hold" so as to continuously supply at least 65 degrees of heat.  Given that the utility bills for the insured premises indicate that very little gas was used during Plaintiffs' absence, and in light of the fact that the thermostats were set to "OFF" when Plaintiffs returned, it appears, as Defendant argues, that Plaintiffs rely merely upon speculation in opposing Defendant's motion.  However, a reasonable factfinder could conclude that Plaintiffs kept the thermostat on the furnace at 65 degrees while they were gone, that the furnace and/or the connected thermostat intermittently failed in Plaintiffs' absence, and that someone other than Plaintiffs turned the thermostats to the "OFF" positions before the February 2, 2022 inspection.  On this last issue, although Ms. Marigliano attests that she contacted representatives of the Beacon Fire Department and the Beacon Water Department who purportedly confirmed "that no officials would have touched the thermostats when they were at the Property following the loss," this contention is based upon hearsay and does not rule out the possibility that someone other than an "official" from one of these two organizations turned off the thermostats when they first entered the insured premises. Given these disputed questions of material fact, the Court denies Defendant's motion for summary judgment.

**C.      Plaintiffs' Motion for Summary Judgment**

The Court denies Plaintiffs' motion for summary judgment.  The motion, essentially, consists of a one sentence request that the Court search the record and find a reason to grant Plaintiffs summary judgment on liability.  As indicated above, it is not the Court's function to search the record and apply facts that the parties do not otherwise identify.  As the Second Circuit has observed, "'Fed. R. Civ. P. 56 does not impose an obligation [on the court considering a motion for summary judgment] to perform an independent review of the record to find proof of a factual dispute.'"  *In re Agent Orange Prod. Liab. Litig.,* 517 F.3d 76, 91 n.14 (2d Cir. 2008) (quoting *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir. 2002)).  By the same reasoning, the Court is not obligated to search the record to find a basis for summary judgment where one has not been established as is the case here.

Furthermore, to the extent that Plaintiffs' October 3, 2023 filing, *see* Dkt. No. 37, could be considered a timely submitted summary judgment motion, which it is not, Plaintiffs submitted no Statement of Material Facts therewith.  Therefore, the Court denies that late-filed and incomplete motion.  *See* N.D.N.Y. L.R. 56.1(a) (providing that "[f]ailure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion")

**IV. CONCLUSION**

Having reviewed the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment, *see* Dkt. No. 31, is **DENIED**; and the Court further

**ORDERS** that Plaintiffs' "Motion to Supplement Pleadings," *see* Dkt. No. 36, is

**DENIED** with leave renew in connection with the trial of this matter; and the Court further

**ORDERS** that Plaintiffs' "First Motion for Summary Judgment," *see* Dkt. No. 37, is

**DENIED**; and the Court further

**ORDERS** that, no later than ten days after the date of this Memorandum-Decision and

Order, the parties shall file a joint letter indicating on which of the following dates they are

available for trial – July 7, 2025; July 14, 2025; August 18, 2025; August 25, 2025 -- and the

number of days that they will require for the trial of this matter, which will be a bench trial.


**IT IS SO ORDERED**.

Dated: July 22, 2024
        Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge